IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIMOTHY D. KULP, Individually and As Administrator of the Estate of Timothy M. Kulp, Deceased; and<br>CAROL L. KULP,<br><br>            Plaintiffs,<br><br>            vs.<br><br>SONIA VERUETE, Individually and as a Lieutenant at Centre County Prison; SHANNON QUICK, Individually and as Counselor for Centre County Prison; JAMES E. SMITH, Individually and as Lieutenant at Center County Prison, TIMOTHY GALLU, Individually and as Counselor as Centre County Prison; CO DAVID C. KNEPP, CO ANDREWS, CO SHEARER, CO GATES and CO STEFANKO, Individually and as Correctional Officers at Centre County Prison; JOHN DOES NO. 1-10.,<br><br>            Defendants. | CIVIL ACTION NO: 4:03-cv-01474-MM<br><br>JUDGE MALCOLM MUIR<br><br>MARIE MILIE JONES, Esquire<br>PA I.D. No. 49711<br><br>MEYER, DARRAGH, BUCKLER,<br> BEBENEK & ECK, P.L.L.C.<br>U.S. Steel Plaza. Suite 4850<br>600 Grant Street<br>Pittsburgh, PA  15219<br>(412) 261-6600<br><br>**JURY TRIAL DEMANDED** |

P0785900.1

## CONCISE STATEMENT OF UNCONTESTED MATERIAL FACTS

1. On August 25, 2001, decedent, Timothy M. Kulp ("Kulp") was arrested in Centre County after a series of incidents in which he, after drinking alcohol and smoking marijuana, entered the dorm rooms of three sleeping female college students then, without their consent, lied down next to them and indecently fondled them.

   **RR:** Appendix, Ex. A, Plaintiffs' First Amended Complaint at ¶15.

2. Mr. Kulp was interviewed by the police at 7:25 p.m. on August 25, 2001, and admitted to consuming alcoholic beverages, smoking marijuana, and then pushing on girl's doors until he found a room that was unlocked. He further admitted that when he found unlocked rooms, without consent, climbed into bed with female residents.

   **RR:** Ex. B, Kulp arrest documentation (Affidavit of probable cause).

3. On August 26, 2001, at approximately 2:20 a.m., the decedent, Timothy D. Kulp ("Kulp") was committed as a pretrial detainee at the Centre County Prison on charges of burglary, criminal trespass, indecent assault, criminal attempt and harassment. The criminal complaint and affidavit of probable cause were included in Kulp's commitment documentation.

   **RR:** Appendix, Ex. A, Plaintiffs' First Amended Complaint at ¶¶14, 15; Ex. B, Kulp arrest documentation.

4. Upon commitment to the Centre County Prison, inmates would be questioned by a correctional officer using questions from a commitment computer, which would include a suicide risk assessment screening.

   **RR:** Appendix, Ex. C, Depo of S. Veruete at p.16, ll.11-14.

5.  At 2:30 a.m. August 26, 2001, Correctional Officer David C. Knepp conducted the initial commitment questioning and suicide risk assessment screening.

    **RR:** Appendix, Ex. A, Plaintiffs' First Amended Complaint at ¶17; Ex. C, Depo. of S. Veruete at p.46, ll.1-7; Ex. E, Depo. of D. Knepp at p.26, ll.8-16; p.38, ll.18-24 (suicide risk assessment for Kulp time-stamped by computer at 2:30 a.m)

6.  During the suicide risk assessment screening, Correctional Officer Knepp would ask the inmate all the questions on the computer. Officer Knepp recorded that Mr. Kulp reported that he was worried about his current situation. However, Mr. Kulp reported that he did not have a psychiatric history, did not take psychiatric drugs, did not believe his alleged crime was shocking, had never attempted suicide, and did not have thoughts of killing himself. Further, C.O. Knepp recorded his personal observations of Mr. Kulp, including that Mr. Kulp did not show signs of depression, anxiousness, fear, or anger.

    **RR:** Appendix, Ex. D, suicide risk assessment report; Ex. A, Plaintiffs' First Amended Complaint at ¶18; Ex. E, Depo. of D. Knepp at p.27, ll.6-15 (no specific recollection of questioning in this case, but was his practice); see p.28, l.10-p.29, l.2 (would have asked every question listed on suicide risk assessment report); p.33, l.17-p.36, l.20 (would observe inmates' demeanor in completing observations required on suicide prevention screening).

7.  The commitment computer would generate a suicide risk assessment score that would indicate whether the inmate should be placed on suicide watch or not.

    **RR:** Appendix, Ex. C, Depo of S. Veruete at p.19, ll.20-25, l.2.

8.  The commitment computer suicide risk assessment screening did not indicate that Mr. Kulp should be placed on suicide watch.

    **RR:** Appendix, Ex. C, Depo. of S. Veruete at p.47, l.3-p.48, l.6.

9. Lieutenant Sonia Veruete was the lieutenant on duty at the time of Mr. Kulp's commitment on August 26, 2001.

    **RR:** Appendix, Ex. C, Depo. of S. Veruete at p.35, l.23- p.36, l.2.

10. Lieutenant Sonia Veruete spoke with Mr. Kulp on the evening of his commitment, and reviewed the initial suicide risk assessment screening documents.

    **RR:** Appendix, Ex. C, Depo of S. Veruete at p.36, ll.12-13; p.38, ll.12-14.

11. Lieutenants were not permitted to assign an inmate to suicide watch if the initial suicide screening indicated that it was not warranted.

    **RR:** Appendix, Ex. C, Depo. of S. Veruete at p.33, ll.12-15.

12. Lieutenants could, however, contact mental health professionals at Centre County Can Help.

    **RR:** Appendix, Ex. C, Depo. of S. Veruete at p.35, ll.12-14.

13. Correctional Officer Knepp spoke with Lieutenant Veruete following the suicide screening at 2:30 a.m. to advise the lieutenant that he believed Mr. Kulp was upset.

    **RR:** Appendix, Ex. C, Depo. of S. Veruete at p.51, ll.12-17.

14. Lieutenant Veruete called Centre County Can Help at 2:58 a.m. on August 27, 2001, to request that a mental health professional meet with and evaluate Mr. Kulp.

    **RR:** Appendix, Ex. C, Depo. of S. Veruete at p.50, l.11- p.51, ll. 9.

15. At the time of Mr. Kulp's commitment to the Centre County Prison, there were three levels of housing: General population, administrative segregation, and suicide watch.

    **RR:** Appendix, Ex. G, Depo. of S. Quick, at p.71, ll.3-9.

16. Lieutenant Veruete housed Mr. Kulp in the intermediate level of housing, specifically in Temporary Housing Unit cell no.1 ("THU-1")

    **RR:**    Appendix, Ex. C, Depo. of S. Veruete at p.44, ll.15-18.

17. The THU cells, including THU-1 and THU-2, were located near the central control room where inmates in those cells could be more easily seen and watched.

    **RR:**    Appendix, Ex. C, Depo. of S. Veruete at p.25, ll. 13-14.

18. These THU cells are only 2-3 steps from the commitment area. The THU-1 bed can be seen from the commitment area.

    **RR:**    Appendix, Ex. C, Depo. of S. Veruete at p.71, l.23-p.72, l.1; p.79, ll. 6-8.

19. Lieutenant Veruete's shift ended at 6:59 a.m. on August 26, 2001.

    **RR:**    Appendix, Ex. C, Depo. of S. Veruete at p.56, ll.1-2.

20. When Lt. Veruete's shift ended, Lt. James E. Smith came on duty.

    **RR:**    Appendix, Ex. F, Depo. of J. Smith at p.22, ll.21-23.

21. Lt. Smith recalls Mr. Kulp asking for the TV to be turned on and for a Bible. The prison officials complied.

    **RR:**    Appendix, Ex. F, Depo. of J. Smith at p.9, l.22-p.10, l.3.

22. Lt. Smith recalls plaintiff was quiet, polite and calm. Mr. Kulp did not appear to be upset in any way.

    **RR:**    Appendix, Ex. F, Depo. of J. Smith at p.10, ll.14-22.

23. Lt. Smith saw correctional officers talking with Mr. Kulp about sports. He seemed to be smiling, and not upset or afraid. Mr. Kulp was very mannerly.

    **RR:**    Appendix, Ex. F, Depo. of J. Smith at p.34, ll.1-23.

24. Lt. Veruete told Lt. Smith that she placed Mr. Kulp in THU-1 and called Centre County Can Help.

> **RR:** Appendix, Ex. F, Depo. of J. Smith at p.10, l.23-p.11, l.2.

25. Mr. Kulp remained in THU-1. In fact, he was housed in THU-1 for the remainder of his stay in the prison.

> **RR:** Appendix, Ex. C, Depo. of S. Veruete at p.58, ll.12-15; Ex. F, Depo. of J. Smith at p.10, ll.11-13.

26. Following Lt. Veruete's call to Centre County Can Help, Emily Walker of Can Help contacted Psychologist Shannon Quick at 6:28 a.m. to report that the Prison wanted an evaluation of Mr. Kulp, who was bipolar.

> **RR.** Appendix, Ex. G, Depo. of S. Quick at p.10, l.22- p.11, l.3; Ex. H, Quick records at p.11.

27. At approximately 7:52 a.m. on August 26, 2001, Psychologist Shannon Quick of Centre County Can Help examined Mr. Kulp at the Centre County Prison.

> **RR:** Appendix, Ex. G, Depo. of S. Quick at p.16, ll.17-21 (stating she arrived at prison at 7:45 a.m. left at 11:15 a.m); see also Ex. T, Centre County Jail log (specifically recording that Ms. Quick met with Mr. Kulp at 7:52 a.m); Ex. F, Depo. of J. Smith at p.23, ll.2-4.

28. Psychologist Quick has a bachelor's degree in psychology and biology from Albright, and also works as an intake counselor at Meadows Psychiatric Center in Cente Hall, Pennsylvania. She previously worked as a psychomatrician at the Williamsport Hospital.

> **RR:** Appendix, Ex. G, Depo. of S. Quick at p.7, ll.23-24 (B.S. in psychology/biology); p.5, ll.21-23 (intake assessment counselor); p.6. l.21- p.7, l.8 (regarding service as psychomatrician for Williamsport Hospital performing psychological testing).

29. Psychologist Quick performs suicide risk assessments professionally, and has received training and education in performing such suicide risk assessments.

    **RR.**    Appendix, Ex. G, Depo. of S. Quick at p.45, l.22-p.46, l.6.

30. Psychologist Quick understood her role to be to identify Mr. Kulp's level of crisis and to identify for prison officials the appropriate level of care.

    **RR:**    Appendix, Ex. G, Depo. of S. Quick at p.95, ll.8-12.

31. Psychologist Quick evaluated Mr. Kulp for almost three hours.

    **RR:**    Appendix, Ex. G, Depo. of S. Quick at p.25, l.25- p.26, l.1.

32. Psychologist Quick noted that during their meeting, Mr. Kulp was crying, upset, and anxious.

    **RR:**    Appendix, Ex. G, Depo. of S. Quick at p.24, ll.24-25; Ex. A, Plaintiffs' First Amended Complaint at ¶24.

33. Psychologist Quick was aware that Mr. Kulp had been arrested for burglary, indecent assault, and breaking and entering. Ms. Quick further knew that Mr. Kulp had checked female student's doors to find ones that were unlocked, then entered the rooms and crawled into bed with them.

    **RR.**    Appendix, Ex. G, Depo. of S. Quick at p.29, ll.22-24; p.30 ll.17-23.

34. Psychologist Quick noted that Mr. Kulp had been diagnosed with bi-polar disorder but was refusing to take his medication for such disorder; and was having passive suicidal thoughts "in the form of believing things could not get worse," but she did not believe that Kulp currently posed a threat to himself.

    **RR:**    Appendix, Ex. A, Plaintiffs' First Amended Complaint at ¶24; Ex. G, Depo. of S. Quick at p.43. l.21-p.44, l.13; Ex. H, Quick records at p.11 (consultation record).

35. Psychologist Quick asked Mr. Kulp numerous times over the course of the three hour evaluation whether he planned to harm himself or others. His answers were always consistent, and always indicated that he did not plan to harm himself.

> **RR.** Appendix, Ex. G, Depo. of S. Quick at p.36, l.24- p.38, l.11.

36. Mr. Kulp told Psychologist Quick that he did not have an active plan to harm himself, and did not intend to harm himself.

> **RR:** Appendix, Ex. G, Depo. of S. Quick at p.35, ll.13-24 (no homicidal thoughts); p.37, ll.22-25; p. 38, ll.9-11 ("he denied he was having suicidal thoughts").

37. Psychologist Quick did not believe Mr. Kulp was suicidal or a risk to himself. By using the term "passively suicidal", she meant that he was feeling hopeless and concerned about his alternatives.

> **RR:** Appendix, Ex. G, Depo. of S. Quick at pp.43, l.22 - p.44, l.13.

38. Ms. Quick did not believe Mr. Kulp posed an imminent risk of suicide.

> **RR:** Appendix, Ex. G, Depo. of S. Quick at p.103, ll.11-12; see also Ex. T, Centre County Prison log (noting Quick stated "after the interview inmate is not a threat to himself at this time"); Ex. F, Depo. of J. Smith at p.15, ll.6-15 (stating that he wrote that entry after discussions with Ms. Quick).

39. Ms. Quick opined that Mr. Kulp did not "appear to pose a threat to himself currently, but does present [a] potential to decompensate rapidly as things progress legally." She "[r]ecommend[ed] [him] to see [a] counselor."

> **RR:** Appendix, Ex. H, Quick records, at p.11 (narrative report).

40. Psychologist Quick opined at that time that Mr. Kulp's suicide risk was at a "distressing" level, which meant that he was not at an imminent risk to kill himself.

    **RR:**    Appendix, Ex. G, Depo. of S. Quick at p.48, l.6-p.49, l.16.

41.    Psychologist Quick did not believe Kulp needed to be on suicide watch but should be observed in a cell by guards, and not housed in general population.

    **RR:**    Appendix, Ex. G, Depo. of S. Quick at p.46, ll.22-25; Ex. A, Plaintiffs' First Amended Complaint at ¶25; Ex. H, Quick records at p.11 (narrative report).

42.    Psychologist Quick understood that Mr. Kulp was already housed in the Temporary Housing Unit and that she could have suggested a greater level of observation.

    **RR:**    See Appendix, Ex. G, Depo. of S. Quick at p.71, ll.18-20; p.71, ll.3-11.

43.    Psychologist Quick advised Lt. Smith that Mr. Kulp should be in a cell by the guards and should see a counselor.

    **RR:**    Appendix, Ex. G, Depo. of S. Quick at p.71, ll.18-25 (placing Kulp in cell by the guards); p.86, ll.6-8 (recommending counselor see Kulp); Ex. F, Depo. of J. Smith at p.13, ll.3-17.

44.    Lt. Smith followed Ms. Quick's recommendations, and kept Mr. Kulp in THU-1.

    **RR:**    Appendix, Ex. F, Depo. of J. Smith at p.21, ll.1-4; p.15, ll.6-23 (eye kept on Kulp per Ms. Quick's recommendations).

45.    Lt. Smith did nothing to alter Mr. Kulp's confinement in THU-1, or to minimize the amount of scrutiny the correctional officers provided to Mr. Kulp.

    **RR:**    Appendix, Ex. F, Depo. of J. Smith at p.22, ll.3-7, p.25, ll.3-9.

46.    When Lt. Smith went off duty, he relayed to the lieutenant relieving him the need to keep Mr. Kulp under informal watch.

    **RR:**    Appendix, Ex. F, Depo. of J. Smith at p.23, l.15-p.24, l.18.

47. The prison also followed Ms. Quick's recommendations regarding counseling. On Monday, August 27, 2001, Nurse Barb A. Bowersox wrote an e-mail to Timothy J. Gallu, requesting that Mr. Gallu see Mr. Kulp, that day if possible, for counseling needs.

**RR:** Appendix, Ex. I, e-mail from B. Bowersox to T. Gallu.

48. Timothy J. Gallu was, in August of 2001, a prison advocate employed by the Central Intermediate Unit.

**RR:** Appendix, Ex. J, Depo. of T. Gallu at p.7, ll.18-23.

49. In that capacity, he would provide services to inmates, including facilitating phone calls, advocating for them, and helping the inmates to contact attorneys.

**RR:** Appendix, Ex. J, Depo. of T. Gallu at p.8, ll. 8-14.

50. Mr. Gallu had received a two-day suicide prevention training program at Elizabethtown Training Academy for the Department of Corrections prior to his visit with Kulp.

**RR:** Appendix, Ex. J, Depo. of T. Gallu at p.16, ll.14-24.

51. As of the date of his meeting with Mr. Kulp, Mr. Gallu understood the common symptoms of potentially suicidal persons to include crying, having a history of depression, having a history of suicide attempts, having a concrete suicide plan, and voicing suicide plans.

**RR:** Appendix, Ex. J, Depo. of T. Gallu at p.34, ll.15-18.

52. If Mr. Gallu met with an inmate and saw signs of alarm, he would make a mental health referral to Centre County Can Help.

**RR:** Appendix, Ex. J, Depo. of T. Gallu at p.15, ll.3-6.

53. Mr. Gallu reviewed Mr. Kulp's suicide prevention screening before meeting with him.

**RR:** Appendix, Ex. J, Depo. of T. Gallu at p.22, ll.1-5.

54. Mr. Gallu's standard practice was also to see what Centre County Can Help had written in its mental health assessment.

**RR:** Appendix, Ex. J, Depo. of T. Gallu at p.22, ll.14-17.

55. Mr. Gallu met with Mr. Kulp, he noted Kulp to be very polite, a little hesitant, and concerned.

**RR:** Appendix, Ex. J, Depo. of T. Gallu at p.28, l.13-19.

56. Mr. Kulp told Mr. Gallu that he had gotten very drunk and walked into girls' dormitory rooms.

**RR:** Appendix, Ex. J, Depo. of T. Gallu at p.48, ll.20-24.

57. Mr. Gallu's notes indicate that he asked Kulp if he was feeling suicidal.

**RR:** Appendix, Ex. J, Depo. of T. Gallu at p.31, ll.12-14.

58. During the meeting, Mr. Gallu also asked Mr. Kulp if he felt like hurting himself.

**RR:** Appendix, Ex. J, Depo. of T. Gallu at p.50, ll.14-17.

59. Mr. Kulp responded that he did not have a history of suicide and that he was not suicidal.

**RR:** Appendix, Ex. A, Plaintiffs' First Amended Complaint at ¶33; Ex. K, Report of T. Gallu dated 8/28/01 at p.2.

60. Had Mr. Gallu seen indications that Mr. Kulp was suicidal, he would have notified someone at the prison to place him on suicide watch.

      **RR:**    Appendix, Ex. J, Depo. of T. Gallu at p.48, ll.10-13.

61.    Mr. Gallu agreed with Psychologist Quick's recommendation that Mr. Kulp be housed in the Temporary Housing Unit.

      **RR:**    Appendix, Ex. J, Depo. of T. Gallu at p.77, ll.1-4

62.    Mr. Gallu told Mr. Kulp that he would like to refer him to the MH/MR unit of Centre County for an evaluation, because of his prior diagnosis of being bipolar.

      **RR:**    Appendix, Ex. A, Plaintiffs' First Amended Complaint at ¶33; Ex. J, Depo. of T. Gallu at p.49, l.23- p.50, l.13.

63.    With respect to this diagnosis, Mr. Kulp told Mr. Gallu that he did not take his medication because he was "stronger than the illness." Mr. Gallu recommended that he take his medication.

      **RR:**    Appendix, Ex. J, Depo. of T. Gallu at p.49, ll.11-14.

64.    Mr. Kulp told Mr. Gallo that his arrest was a "wake up" and that he was amenable to seeing a mental health professional and trying psychiatric medications.

      **RR:**    Appendix, Ex. K, records of T. Gallu at p.3 (narrative report).

65.    At 10:00 a.m. on Sunday, August 27, Kulp saw the jail physician for a physical. The physician took no steps to obtain any mental health care for Kulp, nor did he make any recommendations relative to suicide prevention.

      **RR:**    Appendix, Ex. L, medical records.

66.    Prior to Mr. Kulp's suicide, all of the correctional officer defendants had received suicide prevention training from the Prison.

      **RR:**    Appendix, Ex. M, depo. of T. McClellan at p.12, ll.13-24 (received annual suicide prevention training); Ex. N., depo. of W. Andrews at p.7, l.24-p.8, l.23; Ex. O, depo. of E. Gates at p.24, ll.16-25; Ex. P,

    depo.of S. Stefanko at p.42, l.21-p.43, l.12; Ex. Q, depo. of M. Shearer at p.8, l.8-p.9, l.11.

67.  Correctional Officers Terry McClellan, Wilmer Andrews, and Michael Shearer worked the 3 p.m. to 11 p.m. shift on August 27, 2001.

  **RR:**  Appendix, Ex. M, Depo. of T. McClellan at p.64, ll.11-25, p.23, ll3-7 (noting he also picked up an extra shift); Ex. N, Depo. of W. Andrews at p.38, ll.8-17; Ex. Q, depo. of M. Shearer at p.10, ll.4-10.

68.  Correctional Officers McClellan, Andrews and Stefanko knew that Mr. Kulp was to be under observation because he was housed in THU-1.

  **RR:**  Appendix, Ex. M, Depo. of T. McClellan at p.33, ll.5-25 (stating he knew Kulp was in THU-1 "so we could watch him"), p.35, ll.12-15 (THU cells typically used to house inmates who were to be watched); Ex. N, depo. of W. Andrews at p.48, l.24- p.49, l.3 (Kulp in THU-1 for observation), p.48, l.24-p.49, l.3 (THU-1 used for multiple uses including suicide watch); Ex. P, Depo. of S. Stefanko at p.36, ll.4-12, 24-25 (eye being kept on Kulp because he was in THU-1); p.24, ll.16-20 (inmates generally placed in THU cells for observation for various reasons).

69.  Correctional Officer McClellan reviewed Mr. Kulp's suicide prevention screening report before his suicide.

  **RR:**  Appendix, Ex. M, Depo. of T. McClellan at p.25, ll.12-18.

70.  On the evening of August 27, 2001, Correctional Officers Andrews and McClellan recall Mr. Kulp standing in his cell watching television. They observed nothing unusual about his demeanor.

  **RR:**  Appendix, Ex. N, Depo. of W. Andrews, at p.27, ll.3-9; p.27, l.24-p.28, l.4; p.35, ll.13-18 (recalling nothing out of the ordinary on his shift); Ex. M, Depo. of T. McClellan at p.24, ll.1-10).

71.  Correctional Officer McClellan recalls Mr. Kulp joking with a male correctional officer around the time that he saw Mr. Kulp watching television.

      **RR:**    Appendix, Ex. M, Depo. of T. McClellan at p.27, l.24-p.28, l.9.

72.    At 10:38 p.m., Correctional Officer McClellan conducted a routine check of the prison and noticed Kulp sitting up on his bed. Correctional Officer McClellan believes Mr. Kulp was watching television at that time.

      **RR:**    Appendix, Ex. A, Plaintiffs' First Amended Complaint at ¶37; Ex. M, Depo. of T. McClellan at p. 42, ll. 12-15; p.39, ll.13-14, p.24, ll.22-24 (Kulp sitting on bed), p.29, ll.1-11 (believes Kulp watching television).

73.    Correctional Officers Eric Gates and Scott Stefanko worked the 11 p.m. to 7 a.m. shift, beginning on August 27 and continuing until August 28, 2001.

      **RR:**    Appendix, Ex. O, Depo. of E. Gates at p.22, ll.15-17; p.24, ll.10-11 (noting that he started his shift a little early); Ex. S, Depo. of S. Stefanko at p.18, ll.23-24.

74.    Correctional Officer Stefanko also knew that Mr. Kulp was to be under observation because he was housed in THU-1.

      **RR:**    Appendix, Ex. P, Depo. of S. Stefanko at p.36, ll.4-12, 24-25 (eye being kept on Kulp because he was in THU-1), p.24, ll. 16-20 (inmates generally placed in THU cells for observation).

75.    At 10:59 p.m., Officer Andrews was in the commitment area. The commitment area was near THU-1.

      **RR:**    Appendix, Ex. N, Depo. of W. Andrews at p.33, ll.17-19 (Andrews in commitment area); Ex. C, Depo. of S. Veruete at p.71, l.21-p.72, l.1 (commitment area is only 2-3 steps from THU-1).

76.    Officer Andrews shift ended, however, prior to the discovery of Mr. Kulp's suicide. Officer Andrews was not present at that time.

      **RR:**    Appendix, Ex. N, depo. of W. Andrews at p.38, ll.8-17 (working 3 to 11 shift); p.40, ll.4-25 (learned of Kulp's suicide when told of it the next morning).

77. Similarly, Correctional Officer Shearer's shift ended prior to the discovery of Mr. Kulp's suicide. Officer Shearer was not present at that time.

> **RR:** Appendix, Ex. Q, depo. of M. Shearer at p.10, ll.4-10 (working 3 to 11 shift); p.13, ll.5-13 (first learned of Kulp's suicide from hearsay around Prison).

78. At 11:06 p.m., only twenty-eight minutes after the last check on Mr. Kulp, Correctional Officer McClellan noticed that he could not see Mr. Kulp sitting or laying on his bunk, so he decided to check on him again.

> **RR:** Appendix, Ex. M, Depo. of T. McClellan at p.46, l.22-p.47, l.3.

79. Correctional Officer McClellan found Mr. Kulp hanging, in a semi-seated position, by a shoelace that was attached around his neck to a bar on his window.

> **RR:** Appendix, Ex. M, Depo. of T. McClellan at p.46, ll.3-7, 19-41; Ex. A, Plaintiffs' First Amended Complaint at ¶39. See also Ex. O, Depo. of E. Gates at p.18, ll.1-5 (Officer Gates' observations of suicide scene)

80. Correctional Officer McClellan called to Correctional Officer Gates to get the key so that he could enter the cell.

> **RR:** Appendix, Ex. M, Depo. of T. McClellan at p.48, ll.3-4.

81. Officer Gates got the key from the control center, which was 30-40 feet from THU-1.

> **RR:** Appendix, Ex. M, Depo. of T. McClellan at p.48, ll.5-8.

82. Officer Gates brought the key. When he arrived at THU-1, he saw that Mr. Kulp had pushed the screen out of the window of the cell, tied a shoelace from it, and was hanging in a seated position.

> **RR:** Appendix, Ex. O, Depo. of E. Gates at p.18, ll. 1-5.

83. This was the first time Correctional Officer Gates had any interaction with Kulp (because Gates had just come on duty minutes before).

> **RR:** Appendix, Ex. O, Depo. of E. Gates at p.9, ll.7-11 (sees Kulp for first time after suicide).

84. Correctional Officers McClellan and Gates entered the cell, cut Mr. Kulp down, and initiated CPR and rescue breathing.

> **RR:** Appendix, Ex. M, Depo. of T. McClellan at p.48, ll.18-20, p.52, l.13-p.53, l.23; Ex. O, Depo of E. Gates at p.9, ll.19-25.

85. Correctional Officer Stefanko was called by the lieutenant on duty, Lt. Veruete, who ordered him to lock down the cell block and to come to THU-1 to assist Officers McClellan and Gates.

> **RR:** Appendix, Ex. S, Depo. of S. Stefanko at p.20, ll.13-18.

86. At the time Correctional Officers McClellan and Gates entered the cell, Kulp was unconscious, but still had a pulse.

> **RR:** Appendix, Ex. A, Plaintiffs' First Amended Complaint at ¶40; Ex. O, Depo. of E.Gates at p.27, ll.5-18.

87. EMT's were called, and took over the resuscitation efforts upon arrival.

> **RR:** Appendix, Ex. M, Depo. of T. McClellan at p.55, ll.17-18.

88. Mr. Kulp transported to a hospital, where he was pronounced dead at 12:06 a.m. on August 28, 2001.

> **RR:** Appendix, Ex. A, Plaintiffs' First Amended Complaint at ¶41.

89. There is no evidence Mr. Kulp ever attempted suicide prior to August 27, 2001. Plaintiff Timothy D. Kulp is unaware of Timothy M. Kulp ever having any suicidal ideations prior to his committing suicide on August 27, 2001.

    **RR:**    Appendix, Ex. R, Depo. of T. Kulp at p.123, ll.4-6.

90.    Plaintiff Carol Kulp did not know of Timothy M. Kulp ever expressing any prior interest in suicide before August 27, 2001.

    **RR:**    Appendix, Ex. S, Depo. of C. Kulp at p.74, ll.8-11.

91.    Plaintiff Carol Kulp knew that Timothy M. Kulp was seen by a psychiatrist prior to his incarceration, but does not know of him expressing any concerns about harming himself.

    **RR:**    Appendix, Ex. S, Depo. of C. Kulp at p.20, ll.15-17.

92.    Prior to the incarceration at issue in this case, plaintiff Carol Kulp discussed suicide with Timothy M. Kulp. Mr. Kulp said he would never commit suicide.[1]

    **RR:**    Appendix, Ex. S, Depo. of C. Kulp at p.74, ll.16-22.

    Respectfully submitted,

BY:    /s/ Marie Milie Jones
MARIE MILIE JONES, Esquire
PA I.D. #49711

U.S. Steel Plaza, Suite 4850
600 Grant Street
Pittsburgh, PA 15219
(412) 261-6600 (Phone)
(412) 471-2754 (Fax)
E-Mail: mjones@mdbbe.com

Counsel for Defendants, LIEUTENANT SONIA VERUETE, LIEUTENANT JAMES E. SMITH, CORRECTIONAL OFFICERS DAVID C. KNEPP, WILMER S. ANDREWS, Jr., MICHAEL SHEARER, ERIC R. GATES and SCOTT L. STEFANKO

---

[1] There is no evidence that the Centre County prison defendants were aware of any discussions between Mr. Kulp and his mother.

## APPENDIX

Ex. A, Plaintiffs' First Amended Complaint

Ex. B, Kulp arrest documentation

Ex. C, Depo. of S. Veruete

Ex D, Suicide risk assessment report

Ex. E, Depo. of D. Knepp

Ex. F, Depo. of J. Smith

Ex. G, Depo. of S. Quick

Ex. H, Quick Records

Ex. I, E-mail from B. Bowersox to T. Gallu

Ex. J, Depo. of T. Gallu

Ex. K, Report of T. Gallu

Ex. L, medical records

Ex. M, Depo. of T. McClellan

Ex. N, Depo. of W. Andrews

Ex. O, Depo. of E. Gates

Ex. P, Depo. of S. Stefanko

Ex. Q, Depo of M. Shearer

Ex. R, Depo. of T. Kulp

Ex. S, Depo. of C. Kulp

Ex. T, Centre County Prison log

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the within **CONCISE STATEMENT OF UNCONTESTED MATERIAL FACTS** has been served upon all parties either individually or through counsel by:

- ____ Hand-Delivery
- √ First-Class Mail, Postage Prepaid, or E-Mail
- ____ Certified Mail-Return Receipt Requested
- ____ Facsimile
- ____ Federal Express

at the following addresses:

Jeffrey C. Dohrmann, Esquire
Rieders Travis Humphrey Harris Waters &
 Waffenschmidt
161 West Third Street
Williamsport, PA 17701
*(Counsel for Plaintiffs)*

Charles A. Fitzpatrick, III, Esquire
William C. McGovern, Esquire
Mylotte David & Fitzpatrick
1635 Market Street, 9th Floor
Philadelphia, PA 19103
*(Counsel for Shannon Quick)*

Stuart L. Hall, Esquire
Snowiss, Steinberg, Faulkner & Hall, LLP
333 North Vesper Street
P.O. Box 5
Lock Haven, PA 17745
*(Counsel for Timothy Gallu)*

Date:  August 31, 2006

/s/ Marie Milie Jones
MARIE MILIE JONES, ESQUIRE
PA I.D. #49711

U.S. Steel Tower, Suite 4850
600 Grant Street
Pittsburgh, PA 15219
(412) 261-6600 (Phone)
(412) 471-2754 (Fax)
E-Mail:  mjones@mdbbe.com

Counsel for Defendants, LIEUTENANT SONIA VERUETE, LIEUTENANT JAMES E. SMITH, CORRECTIONAL OFFICERS DAVID C. KNEPP, WILMER S. ANDREWS, Jr., SHEARER, ERIC R. GATES and SCOTT L. STEFANKO

P0786516.1