IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY D. KULP, Individually    :
and as Administrator of the      :
Estate of Timothy M. Kulp,       :
Deceased; and CAROL L. KULP,     :
                                 :
          Plaintiffs             :  No. 4:03-CV-1474
                                 :
     vs.                         :  Complaint Filed 8/25/03
                                 :
SONIA VERUETE, ET AL.,           :  (Judge Muir)
                                 :
     Defendants                  :

OPINION

MUIR, District Judge.

I.  Introduction.

        The procedural history of this case is set forth in

prior orders of court and we will not repeat that history other

than as needed to address the pending motions for summary

judgment.  This action arises out of the suicide of Plaintiffs'

son, Timothy M. Kulp, while incarcerated at the Centre County

Prison.

        On June 29 and July 1, 2004, we issued orders which

dismissed the bulk of the claims set forth in an amended

complaint filed on May 3, 2004.  After those orders were issued

the only matters remaining were a motion to dismiss a so-called

"Corrected First Amended Complaint" and claims against 10 "John

Doe" Defendants.  On July 27, 2004, Plaintiffs filed a notice of

appeal from our orders of June 29 and July 1, 2004.  On July 28,

2004, we dismissed the "Corrected First Amended Complaint."  With

respect to the appeal, the Court of Appeals on September 9, 2004,
granted a defense motion to amend the case caption to reflect
only those parties named in the amended complaint.  The
Defendants named in the amended complaint were the following
individuals: (1) Sonia Veruete, Lieutenant; (2) Shannon Quick,
Counselor; (3) James E. Smith, Lieutenant: (4)  Timothy Gallu,
Counselor; (5) David C. Knepp, correctional officer; (6) Terry L.
McClellan, correctional officer; (7) Wilmer S. Andrews, Jr.,
correctional officer; (8) correctional officer Shearer; (9) Eric
R. Gates, correctional officer; (10) Scott L. Stefanko,
correctional officer; and (11) John Does No. 1-10.

     On February 10, 2006, the Court of Appeals reversed our
orders of June 29 and July 1, 2004 and remanded the case to us
for further proceedings.  The Court of Appeals relying on <u>Colburn
v. Upper Darby Township</u>, 838 F.2d 663 (3d Cir. 1988)(hereinafter
referred to as "Colburn I") stated that "[l]ike the complaint in
<u>Colburn I</u>, as supplemented by the memorandum, the Amended
Complaint in this case contains numerous facts which, when viewed
in their totality and supplemented by information obtained in
discovery, might support an inference of liability on the part of
some or all of the Prison employees." Doc. 126-2, Not
Precedential Slip Opinion, p. 10.  The Court of Appeals further
stated that the amended complaint "was dismissed before they had
an opportunity for discovery, and 'any expectation of factual

sufficiency was premature.'" Id. at 11.  On March 6, 2006, the
Court of Appeals issued a certified copy of the judgment in lieu
of a formal mandate.

On March 8, 2006, we issued a scheduling order setting
a discovery deadline of July 21, 2006, a dispositive motions
deadline of August 1, 2006, a pretrial conference for October 2,
2006, and jury selection for November 2, 2006.  On July 10, 2006,
Plaintiffs filed a motion for a one month extension of all
scheduling deadlines.  On July 11, 2006, we issued an order
placing the case on the December, 2006, trial list and adjusting
the scheduling deadlines in accordance with that trial list. The
dispositive motion deadline under that order was September 1,
2006.

On August 30, 2006, Defendant Gallu filed a motion for
summary judgment, a statement of material facts, evidentiary
materials and a supporting brief.  Plaintiffs filed a brief in
opposition on September 26, 2006.

On August 31, 2006, Defendants Veruete, Smith,
Stefanko, Knepp, McClellan, Andrews, Gates and Shearer filed a
motion for summary judgment, a statement of material facts,
evidentiary materials and a supporting brief.  On September 25,
2006, Plaintiff filed a brief in opposition.

On September 1, 2006, Defendant Shannon Quick filed a
motion for summary judgment, a statement of material facts,

evidentiary materials, and a supporting brief.  Plaintiffs filed
a brief in opposition on September 25, 2006.

        The motion for summary judgment filed by Defendants
Veruete, Smith, Stefanko, Knepp, McClellan, Andrews, Gates and
Shearer and the motion for summary judgment filed by Defendant
Quick became ripe for disposition on October 13, 2006, when those
Defendants elected not to file reply briefs.  Defendant Gallu's
motion for summary judgment became ripe for disposition on
October 16, 2006, when he elected not to file a reply brief.

                    II.  Legal Standard.

        The court will consider the motions for summary
judgment under the well-known and accepted standards to be
considered in determining whether or not to grant summary
judgment.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
247-48 (1986); <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 324
(1986); <u>Matsushita Electric Industrial Co. v. Zenith Radio</u>, 475
U.S. 574, 586 (1986).  Federal Rule of Civil Procedure 56©
requires that the court render summary judgment "forthwith if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56©.  If, however, "the evidentiary matter in
support of the motion does not establish the absence of a genuine

                              4

issue, summary judgment must be denied even if no opposing
evidentiary matter is presented."  Advisory Committee Notes to
Fed. R. Civ. P. 56(e)(1963 Amend.).  Furthermore, the evidence
and inferences therefrom must be viewed in a light most favorable
to the nonmoving party.  <u>Matsushita Elec. Indus. Co. Ltd.</u>, 475
U.S. at 585.

     Initially, the moving party has the burden of
demonstrating the absence of a genuine issue of material fact.
<u>Celotex Corporation</u>, 477 U.S. at 323.  This may be met by the
moving party pointing out to the court that there is an absence
of evidence to support an essential element as to which the non-
moving party will bear the burden of proof at trial.  Id. at 325.

     Rule 56 provides that, where a summary judgment motion
is made and properly supported, the adverse party must show by
affidavits, pleadings, depositions, answers to interrogatories,
and admissions on file that there is a genuine issue for trial.
Fed. R. Civ. P. 56(e).  The United States Supreme Court has
commented that this requirement is tantamount to the non-moving
party making a sufficient showing as to the essential elements of
its case that a reasonable judge or jury could find in its favor.
<u>Celotex Corporation</u>, 477 U.S. at 322-23.

     When addressing a motion for such a judgment, our
inquiry focuses on "whether <u>the evidence</u> presents a sufficient
disagreement to require [a trial] or whether it is so one-sided

that one party must prevail as a matter of law."  <u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. at 251-52(emphasis added).

As summarized by the Advisory Committee on Civil Rules,
"[t]he very mission of the summary judgment procedure is to
pierce the pleadings and to assess the proof in order to see
whether there is a genuine need for trial."  Fed. R. Civ. P. 56,
Advisory Committee Note to 1963 Amendment.

III.  Summary Judgment Record.

The following rendition of the facts of this case is
gleaned from the summary judgment record submitted by the
parties, which includes the amended complaint, deposition
transcripts, state court documents and prison records.

On August 26, 2001, a criminal complaint with an
affidavit of probable cause attached was filed against Timothy M.
Kulp by Officer John A. Torres, Jr., of the Pennsylvania State
University ("PSU") Police Department.  The complaint and
affidavit of probable cause were filed before District Justice
Ronald J. Horner in Centre Hall, Pennsylvania.

According to the complaint and affidavit of probable
cause,  Timothy M. Kulp  on August 25, 2001, at approximately
2:45 a.m., entered Mifflin Hall, a building located on the
Pennsylvania State University campus which housed female students
with the permission of a female student housed in that building.
After entering Mifflin Hall, the female student who permitted him

to do so observed Kulp attempt to enter several rooms between rooms # 120 and #117 by pushing on locked residence hall room doors.  It is alleged that at 4:05 a.m. Kulp entered room 302 and lay down next to the female occupant of the room who was sleeping.  The female occupant was awakened by the conduct of Kulp which included having his "right hand up her shorts resting on her thigh and vagina."

The affidavit of probable cause reveals that Kulp's next stop was room 105.  It is alleged Kulp entered that room between 4:45 a.m. and 5:00 a.m. entered a bed occupied by a female student and "kissed her on the lips" and "touch[ed] her indecently without her consent."  Kulp allegedly "had one hand beneath her shirt on her breast and the other hand down the front of her pants and underwear and on her vagina."  Kulp thereafter entered room 301 at approximately 5:20 a.m. and lay down on the bed of a third female student without her consent.

On August 25, 2001, Police Officer Torres received reports about Kulp's entry into rooms 105, 301 and 302 of Mifflin Hall.  Officer Torres spoke to the female occupant of room 105 at about 3:57 p.m. on August 25, 2001.  At 5:15 p.m. on August 25, 2001, Ronald Schreffler, an investigator with the PSU Police Department, spoke to the female occupant of room 301.  At 7:00 p.m. on August 25, 2001, an officer spoke with the female student who permitted Kulp to enter Mifflin Hall and observed Kulp

attempt to enter several rooms.

At 7:25 p.m. on August 25, 2001, Investigator Schreffler interviewed Kulp at the PSU Police Department. During the course of that interview Kulp admitted that he entered Mifflin Hall and engaged in the conduct outlined above.

Officer Torres at 8:00 p.m. on August 25, 2001, also interviewed Kulp. Officer Torres summarizes that interview in the affidavit of probable cause as follows:

> Kulp stated he went to Phi Delta Theta fraternity for a party on 8/25/01. At this fraternity, Kulp said he consumed beer and vodka and smoked marijuana from a bong. Kulp stated he then went to another fraternity and continued to consume alcohol. Kulp stated he then walked back onto the PSU campus. Kulp stated he intentionally walked to Mifflin Hall to find female companionship. Kulp stated he was looking for someone to hold and love as well as have sex with. Kulp stated he arrived at Mifflin Hall. Kulp stated he was not a resident of Mifflin Hall. Kulp stated he could not remember the means by which he entered. Kulp stated he then wanted female companionship so he intentionally started going room by room pushing on doors to find unlocked ones. When asked, Kulp stated his intentions were to get into bed with a female to hold her and possibly have sex with her. He said he just wanted to be with someone. When asked how many residence hall rooms Kulp entered, he stated he could not give a number, but that it was "a lot." Kulp admitted to fondling the breasts and vaginas of an unknown number of females in Mifflin Hall. When asked, Kulp stated he did not have the permission or consent of any of the occupants to enter their respective residence hall rooms or get into bed with them or have any physical contact with them.

With respect to Kulp's entry into room 302, Officer Torres at 10:00 p.m. interviewed the female occupant of that room.

After all the interviews were conducted, the criminal

complaint and affidavit of probable cause were prepared and an arrest warrant was obtained from District Justice Horner.  Kulp was charged as follows:

| Offense | Grade | # of Counts | Section of Title 18 of the Pennsylvania Crimes Code |
|---------|-------|-------------|------------------------------------------------------|
| Burglary | Felony of the First Degree | 3 | 3502(a) |
| Criminal Trespass | Felony of the Third Degree | 1 | 3503(a)(1)(I) |
| Indecent Assault | Misdemeanor of Second Degree | 2 | 3126(a)(1)(4) |
| Harassment | Summary Offense | 3 | 2709(a)(1) |
| Criminal Attempt | Felony of the First Degree | 1 | 901(a) |

Kulp was arraigned on the charges before District Justice Horner and then transported to the Centre County Prison by Officers Torres and Hess.  The officers along with Kulp arrived at the Centre County Prison at 2:24 a.m. on August 26, 2001.  The criminal complaint and affidavit of probable cause were included in Kulp's commitment documentation.

        In a supplemental incident report prepared on August 30, 2001, Officer Torres explains what occurred when he arrived at the Centre County Prison.  In that report Officer Torres states in relevant part as follows:

9

> On 26 August 2001 at [2:24 a.m.], this officer and
> Officer Hess arrived at the Centre County Jail with
> Kulp.  Officers then entered the holding area of the
> jail and this officer spoke with the CCJ Lt. in charge
> at the intake holding area.  This officer spoke to Lt.
> Sonia Vervete (sic).  Lt. Vervete (sic) was advised by
> this officer that Kulp was non-violent with officers.
> The Lt. was also advised that Kulp exhibited bazaar
> behavior including mood swings while in the custody of
> officers.  The Lt. was told that Kulp told officers in
> the interview that he was diagnosed as bi-polar (sic)
> and manic depressive but was not taking his medications
> as prescribed.  <u>Lt. Vervete (sic) was told that Kulp
> was question (sic) by this officer concerning his
> mental status and he made no threats or expressed in
> any way that he was thinking of harming himself</u>.  Lt.
> Vervete (sic)was advised to keep an eye on him due to
> the above. Lt. Vervete (sic) made the statement to this
> officer that she noticed right away that "something was
> up" with him.  The Lt. advised that they (staff) would
> keep and (sic) eye on him. Lt. Vervete (sic) was also
> advised that Kulp had charges pending against him in
> Pottstown, PA . . . .

Doc. 154, Exhibit 2 to Plaintiffs' Brief in Opposition (emphasis

added).

Several documents were generated at or about the time

of Kulp's commitment to the Centre County Prison.  First, there

is a document which has been referred to by Plaintiffs as

"Kulp's Adjustment Record."  Doc. 154, Exhibit 7 to Plaintiffs'

Brief in Opposition.  That document is a printed form.  At the

top of the document is the name "Kulp, Timothy Michael" which is

handwritten.  Under the "Name" section in the "Remarks" section

of the document is the handwritten notation "cooperative, upset."

Next to the "Remarks" section is the "Date Received" section with

the handwritten date "8-26-01."  Under the date received section

is the "Cell No." section which is handwritten in as "THU 1."
Next to the cell number is a section entitled "Placed By" with
the name "Lt. Veruete" handwritten.  Below these introductory
sections of the form is a columnar comment section which notes
the date, time, comment and officer's signature.  There are only
two comments on the document.  The first comment is dated "3-26-
01."  The time is noted as "02:20."  The comment is
"cooperative, upset" and the signature is illegible.  The second
comment is dated "3-26-01.  The time is noted as "0752 AM."  The
comment is as follows:

> "Centre County Can Help" Shannon Quick is [illegible]
> to interview inmate. (See attached report) <u>states after
> the interview that inmate is not a threat to himself at
> this time.  Suggests he see prison counselor tomorrow
> and further suggests we keep an eye on him.</u>

(Emphasis added.)  This comment was signed by "Lt. Smith."  It is
not clear whether the sections of the top portion of this
document (Name, Remarks, Date Received, Cell No. and Placed By)
were completed at the same time.

The top portion of "Kulp's Adjustment Record" indicates
that Kulp was placed in cell number "THU 1."  Defendant Veruete
during her deposition testified that "THU 1" referred to
Temporary Housing Unit 1 which was close to the intake or
commitment area.  However, she also testified that Kulp was not
placed in Temporary Housing Unit 1 until after the commitment
process was completed and she had spoken to Defendant Knepp

regarding his observations that Kulp was "upset."

Defendant Knepp during his deposition testified that
the commitment process, including the suicide prevention
screening, took between 20 and 45 minutes to complete.  We
further know from prison records that Defendant Veruete called
Centre County Can Help at 2:58 a.m. after speaking to Defendant
Knepp about his concern that Kulp was "upset."  If the commitment
process took 20 minutes then Kulp would have been placed in
Temporary Housing Unit 1 sometime between 2:40 a.m. and 2:58 a.m
on August 26, 2001.   If we accept Officer Torres's report that
he arrived at Centre County Prison at 2:24 a.m., Kulp would have
been placed in Temporary Housing Unit 1 sometime between 2:44 a.m
and 2:58 a.m.  Even before Shannon Quick of Centre County Can
Help was contacted, Defendant Veruete decided to place Kulp in
Temporary Housing Unit 1 so that he could be observed more
easily.

As noted above, the officer's signature with respect to
the first comment on the "Adjustment Record" is illegible.
However, the handwriting in the introductory portion of that
document is very similar to the handwriting of the first comment,
i.e., "cooperative, upset."  Defendant Knepp testified during his
deposition that he did not complete the introductory portion of
the "Adjustment Record" and that the illegible signature was not
his signature.

During the commitment process a document entitled "Medical Observation Report" was prepared. See Doc. 154, Exhibit 9 to Plaintiffs' Brief in Opposition. The document provided to us consists of two pages. At the top of the first page are the words "Medical Observation Report Centre County" The document then sets forth, inter alia, the name of the decedent and his sex, race, birth date, booking number, and social security number. A series of medical questions commences approximately halfway down the first page. The "Medical Questions" portion of the two page document states in relevant part as follows:

Medical Questions

Answers are Y=Yes, N or Blank=No, R=Refused to Answer

| Order | Question | Y/N/R | Brief Note |
|---|---|---|---|
| 1 | ANSWERED UNRELIABLE | N | |
| 2 | ANSWERS UNAVAILABLE | N | |
| 3 | SEVERE MENTAL PROBLEM | N | |
| 4 | BLEEDING | N | |
| 5 | BREATHALYZER READING | N | |
| 6 | COUGHING/SPITTING | N | |
| 7 | DIFFICULTY BREATHING | N | |
| 8 | DIFFICULTY MOVING | N | |
| 9 | D.T.'S | N | |
| 10 | DRUG INFLUENCE | N | |
| 11 | FEVER | N | |
| 12 | INFESTATION | N | |
| 13 | INTOXICATED | N | |
| 14 | JAUNDICE | N | |
| 15 | MENTAL PROBLEM (OTHER) | Y | Bi-Polar (sic) |
| 16 | TRAUMA | N | |
| 17 | REFUSAL TO ANSWER | N | |
| 18 | ASSAULT RISK | N | |
| 19 | SKIN RASH | N | |
| 20 | SWOLLEN LYMPH NODES | N | |
| 21 | OBVIOUS PAIN | N | |

[CONTINUED ON SECOND PAGE]

```
22 UNCOOPERATIVE          N
23 ALLERGIES              N
24 BIRTH CONTROL PILLS    N
25 DIABETES               N
26 DRUG/ALCOHOL PROBLEM   N
27 EPILEPSY               N
28 HEART DISEASE          N
29 HEPATITIS              N
30 HIGH BLOOD PRESSURE    N
31 HOMOSEXUAL             N
32 ON MEDICATION          N
33 PREGNANT               N
34 RECENTLY ILL/INJURED   N
35 RECENT ABORTION        N
36 SPECIAL DIET           N
37 OTHER HEALTH PROBLEM   N
38 RECENT HEAD INJURY     N
39 TYPE OF SUPERVISION    N
40 DEFENDANT FIT FOR JAIL Y
41 REFERRED TO SICK CALL  Y
42 SENT MEDICAL TREATMENT
   [ILLEGIBLE]            Y
43 ISOLATED FOR MEDICAL/
   MENTAL                 Y
44 GENERAL POPULATION     N
45 OTHER HOUSING          N
46 OUTSIDE HOSPITAL CARE
   RECOM                  N
```

At the bottom of the above series of questions was the signature

of Timothy M. Kulp and the signature of a witness.   Immediately

before the signature of Timothy M. Kulp is the following

statement: "By my signature, I agree that the above is true to

the best of my knowledge."   The signature of the witness is

illegible but appears to be the same signature as that of the

officer which appears after the first comment on the "Adjustment

Record."  Whoever completed this "Medical Observation Report"[1] was completing it on the basis of his or her observations of Kulp and Kulp's answers to various questions.  Furthermore, as noted, Kulp signed and acknowledged the accuracy of the document.

The individual completing the document noted that Kulp did not have "severe mental problems."  However, the officer did note that Kulp had a "mental problem (other) and was "bi-polar" (sic).  The officer also indicated that Kulp was "Fit for Jail," and should be "Referred to Sick Call."   Finally, the officer who completed the document noted that Kulp should be "isolated for medical/mental" reasons, that Kulp was "very upset," and that he should not be placed in general population.

A third document completed during the commitment process is Plaintiffs' Exhibit 8 which is entitled "Inmate Commitment Summary Report Centre County."  Doc. 154, Exhibit 8 attached to Plaintiffs' Brief in Opposition.  The document consists of four pages.  On the first page, inter alia, are the decedent's name, age, sex, race and date and time of commitment. The date and time of commitment are noted as August 26, 2006, at "02:24."  On the second page the pertinent section is entitled "Special Concerns."  That section states as follows:

---

[1]The series of medical questions set forth on the  so-called "Medical Observation Report" appear to be the "Medical Screening Questionnaire" referred to in Centre County Prison Policies and Procedures, Number C-112, which was submitted by Plaintiffs as Exhibit 12 attached to their brief in opposition.

```
        Special Concerns:

        Physical Handicaps          None

        Medical Alert Information   none

        Drug Addict                 No

        Alcohol Addition            Yes

        Mental Illness              Yes
```

The third and fourth pages of the document do not contain any relevant information.

A fourth document completed during the commitment process is what the parties have referred to as the "Suicide Prevention Screening Questionnaire" which was submitted to us as Plaintiffs' Exhibit 3.  Doc. 154, Exhibit 3 to Plaintiffs' Brief in Opposition.  At the top of the document are the decedent's name, date of birth, sex, screen date and time and the name of the screening officer.   The screening officer was Defendant Knepp.   This document is in fact according to a prison policy statement the "Booking Screening Questionnaire."  See Plaintiffs' Exhibit 12 (Doc. 154, Attachment Exhibit 12, page 14, entitled  "Appendix C-112C (A)").   Plaintiffs' Exhibit  8 (Quick Deposition Exhibit 2) which is entitled "Inmate Commitment Summary Report Centre County" is a separate document and appears to have been referred to by Plaintiffs' counsel during the deposition of Defendant Veruete as the "booking observation documents."   See page 56,  line 22, through page 57, line 6  of

16

Defendant Veruete's deposition transcript dated July 24, 2006.

Before outlining Kulp's answers to the suicide screening questionnaire (the "Booking Screening Questionnaire") and the result of the suicide screening we will review the prison policy relating to suicide prevention screening.   The prison policy relating to suicide prevention is set forth in Plaintiffs' Exhibit 12.   Under that policy "suicide risk" is defined as "[t]he belief based on the Medical Screening Questionnaire and Booking Screening Questionnaire[2](see Appendix C-112(C)A) or other evidence that an inmate might commit suicide."  "Suicide Threat" is defined as "[a] verbal or written statement made by an inmate expressing their (sic) intent to take their (sic) own life made to a staff member, another inmate, a family member or any other reliable source provided it is documented."   "Suicide Attempt" is defined as "[a] physical effort of various means made by an inmate to take his/her own life."   The summary judgment record reveals no evidence that any of the Defendants were aware of suicide attempts or suicide threats.  With respect to the prison policy, the issue we must explore is whether Kulp was a suicide risk and if so what preventive action the policy required the prison staff to take.

The prison policy establishes a procedure for

---

[2]The "Booking Screening Questionnaire" as noted is in fact what the parties have been referring to as the suicide prevention screening questionnaire.

commitment screening.  The policy requires that if an individual being committed to the prison has "a positive response to drug/alcohol usage" the correctional officer conducting the commitment screening will "forward [the Medical Screening Questionnaire] to the Medical Department if [there are] 8 or more yes answers."  The Medical Screening Questionnaire is Plaintiffs' Exhibit 9 which contained 46 questions to be answered and was referred to above.  Out of the 46 questions there were only 4 "yes" answers.

The next section of the prison policy statement which is of some relevance is section H which sets forth what preventive action is to be taken if an inmate is a suicide risk. That section states in toto as follows:

   H. Preventive Action for Suicide Risk, Intoxication,
      and/or Detoxification

   1. Eight "Yes" answers on the Medical Screening
      Questionnaire (In Computer) temporarily identifies
      the inmate as a suicide risk and triggers the
      following preventive measures:

      a.  Notify Lieutenant who may at his or her
          discretion alert the on-call counseling or
          medical staff in case of psychiatric or
          medical emergencies.

      b.  Shift leader will co-sign Medical Screening
          Questionnaire and disseminate copy to medical
          or counseling staff, as appropriate.

      c.  The inmate is to be issued prevention kit
          including - paper slippers, blue paper gown,
          pillow and proper blanket. No linens,
          shoelaces, pencils or pens.

18

  d. The inmate will be housed in either a holding cell (RHU), (THU) or a Unit 1, 2, 19, 20 cell that provides an increased view of the inmate.

  e. Mattress will be placed on the floor for severely intoxicated inmates.

As noted above, Kulp only had 4 "Yes" answers on the Medical Screening Questionnaire.

  We will now review the answers to the "Booking Screening Questionnaire" or as the parties have referred to it the suicide screening questionnaire.  Below the decedent's name it is noted that the decedent did not show "serious psychiatric problems during prior incarceration."  Under that statement are listed 18 numbered questions and answers as follows:

| Order | Question Asked | Y/N Reply | Comment |
|---|---|---|---|
| 1 | OBSERVATION: ARRESTING/TRANSPORT OFFICER BELIEVES INDIVIDUAL IS SUICIDAL | N | |
| 2 | LACKS CLOSE FAMILY/FRIEND IN THE LOCAL COMMUNITY? | N | |
| 3 | EXPERIENCED LOSS/DEATH WITH THE LAST SIX (6) MONTHS? | N | |
| 4 | WORRIED ABOUT MAJOR PROBLEMS (SUCH AS ILLNESS)? | Y | CURRENT SITUATION |
| 5 | FAMILY MEMBER OR SIGNIFICANT OTHER ATTEMPTED SUICIDE? | N | |
| 6 | HAS PSYCHIATRIC HISTORY OR TAKING PSYCHIATRIC MEDICATION? | N | |
| 7 | HOLDS POSITION OF RESPECT/PROFESSIONAL | | |

```
    JOB IN THE COMMUNITY?                      N

8   ALLEGED CRIME SHOCKING IN NATURE?          N

9   EXPRESSES THOUGHTS OF KILLING SELF?        N

10  HAS SUICIDE PLAN/INSTRUMENT?               N

11  HAS PREVIOUS SUICIDE ATTEMPT?              N

12  EXPRESSES FELLING (SIC) OF NO FUTURE?      N

13  OBSERVATION: SHOWS SIGNS OF DEPRESSION
    (CRYING, SOBBING, ETC.)                    N

14  OBSERVATION: APPEARS ANXIOUS, AFRAID,
    OR ANGRY                                   N

15  OBSERVATION: APPEARS TO FEEL
    EMBARRASSED/ASHAMED?                       N

16  OBSERVATION: ACTING/TALKING IN
    STRANGE OR INCOHERENT MANNER               N

17  OBSERVATION: UNDER THE INFLUENCE OF
    ALCOHOL AND/OR DRUGS                       N

18  OBSERVATION: INCOHERENT OR WITHDRAWN
    AND WON'T SPEAK                            N
```

Defendant Knepp conducted the initial commitment questioning and suicide risk assessment.  He appears to have been assisted by another correctional officer.[3]

---

[3]Plaintiffs contend that Defendant Stefanko assisted Defendant Knepp with the commitment and refers to Exhibit 5 at p. 7.  That exhibit is a portion of the deposition transcript of Defendant Stefanko and does not support Plaintiffs' position that Stefanko "assisted" Knepp. From that portion of the deposition we can only conclude that Stefanko was present when Kulp was committed to the Centre County Prison.  Plaintiffs further contend that Stefanko noted on an "Adjustment Record" (Exhibit 7) that Kulp was "cooperative, upset."  We cannot discern from the signature on that document that the notation "cooperative, upset" was made by Defendant Stefanko.  Plaintiffs have not referred to any other evidentiary materials that would support the assertion that Defendant Stefanko was responsible for the notation "cooperative,

Plaintiffs have focused on several alleged discrepancies between the various commitment documents. We do not discern any major inconsistencies between the various documents. Some of the alleged discrepancies are that the Inmate Commitment Summary Report (Plaintiffs' Exhibit 8, Quick deposition Exhibit 2) states that Kulp had mental illness, the Medical Observation Report (Plaintiffs' Exhibit 9, Gallu deposition Exhibit 3) states that Kulp did not have "severe mental illness," and the Booking Screening Questionnaire (Plaintiffs' Exhibit 3, Veruete deposition Exhibit 5) states that Kulp did not have a psychiatric history. To the extent there are some discrepancies, it is reasonable to conclude that they were the result of more than one officer completing the documents and the fact that some of the answers were based on the observations of the officers and some of the answers came directly from the decedent.

Plaintiffs further argue that question 10 on the Booking Screening Questionnaire (Plaintiffs' Exhibit 3) was answered incorrectly. That question is whether or not Kulp had a "suicide plan/instrument." Plaintiffs contend that Kulp was left with shoelaces which can be considered a suicide instrument.

---

upset." During Knepp's deposition he testified that "another officer may have been [making the notation]" when he was completing the suicide prevention screening questionnaire. See page 44, lines 7-9, of Knepp's deposition transcript. It is possible that the illegible writing set forth in the officer's signature column is the initials "SLS" for "Scott L. Stefanko."

21

Defendant Knepp testified during his deposition that he specifically asked Kulp whether or not he had developed a suicide plan and Kulp answered that question in the negative.  Knepp stated he would not have asked Kulp whether or not he had a suicide instrument but concluded based on his observations of Kulp, the fact that Kulp was already changed into prison "garb," that he did not have a suicide instrument.  Knepp did not consider the shoelaces an instrument of suicide.  Furthermore, the prison policy statement referred to earlier only requires that shoelaces be taken away from those inmates that have been determined to be a "suicide risk."  As noted above "suicide risk" has a specific definition which requires a belief based on the answers to the Medical Screening Questionnaire and Booking Questionnaire or other evidence that an inmate might commit suicide.  There is no evidence in the summary judgment record that anyone had a belief based on those documents that Kulp might commit suicide.

Plaintiffs have also focused on Defendant Knepp's answer to question 8 on the Booking Screening Questionnaire. That question related to whether Kulp's crimes were shocking in nature.  First, it is not clear whether the answer given came from Kulp or was the result of the subjective opinion of Defendant Knepp.  Second, we cannot conclude and a jury could not reasonably conclude that the answer was incorrect.  The crimes

committed by Kulp did not involve violence or physical injury to the victims.

The result of the commitment screening process, that is the medical screening and suicide risk assessment, was that Kulp was placed on an "initial 48 hour admin[istrative] segregation." The date was August 26, 2001, and the approximate time was 2:44 a.m., and after that time there were several other individuals who had contact with Kulp and made recommendations about his confinement and situation.  Kulp did not commit suicide until August 27, 2001, at or about 11:00 p.m.

Shortly after the completion of the commitment process Lieutenant Veruete took steps to contact a counselor and placed Kulp in Temporary Housing Unit 1 ("THU-1") close to the intake area so that he could be easily observed.  It is undisputed that THU-1 was only two to three steps from the commitment or intake area.  The bed in THU-1 can be seen from the commitment area.

The reason for placing Kulp in THU-1 was the fact that Kulp was upset.  The commitment documents bear out that fact. As noted earlier the "Adjustment Record" indicates that Kulp was upset, the "Medical Observation Report" report indicates that Kulp was "very upset" and the "Booking Screening Questionnaire" indicates that Kulp was "worried about major problems . . . [his] current situation."

It is undisputed that the prison staff used a

commitment computer to generate a suicide risk assessment score that would indicate whether the inmate should be placed on suicide watch or not.  It is also undisputed that the commitment computer suicide risk assessment screening did not indicate that Kulp should be placed on suicide watch.  Although Kulp was not placed on a suicide watch which required that an inmate be observed by correctional staff every 15 minutes, Kulp as noted was placed in THU-1 and was under close observation.  See Deposition Transcript of Defendant Veruete, pages 26-27.

Defendant Veruete's shift ended at 6:59 a.m. on August 26, 2001.  At that time Defendant Smith came on duty as the Lieutenant in charge.  Defendant Smith recalls Kulp asking for the TV to be turned on and for a Bible.  The prison staff complied.  Defendant Smith recalls that Kulp was quiet, polite and calm and Kulp did not appear to be upset.  Defendant Smith observed correctional officers communicating with Kulp about sports.  Kulp seemed to be smiling, and not upset or afraid and Kulp was "very mannerly."  Defendant Smith never observed Kulp crying.  Defendant Veruete told Defendant Smith that she placed Kulp in THU-1 and called Centre County Can Help.  Kulp remained in THU-1 for the remainder of his stay in the prison.

Following Defendant Veruete's call to Centre County Can Help, Emily Walker of Can Help contacted Defendant Shannon Quick at 6:28 a.m. to report that the prison wanted an evaluation of

Kulp who was bipolar.  At approximately 7:52 a.m. on August 26, 2001, Defendant Quick examined Kulp at the Centre County Prison. Defendant Quick has a bachelor's degree in psychology and biology and is a mobile crisis counselor with Can Help and an intake counselor at Meadows Psychiatric Center in Centre Hall, Pennsylvania.  Defendant Quick performs suicide risk assessments professionally and has received training and education in performing such suicide risk assessments.

Defendant Quick met with Kulp at the prison from approximately 7:45 a.m. to 11:15 a.m. on August 26, 2001.  During her meeting, Defendant Quick asked Kulp on multiple occasions whether he was suicidal, had a suicide plan or if he had ever attempted suicide in the past.  Kulp repeatedly denied being suicidal or having any thoughts of suicide, a suicide plan or a past history of suicide attempts.

Defendant Quick noted that during the session, Kulp was crying, upset and anxious.  Defendant Quick was aware of the charges filed against Kulp as well as facts supporting those charges.  Defendant Quick understood her role to be to identify Kulp's level of crisis and to identify for the prison the level of care.

Defendant Quick noted that Kulp had been diagnosed with bipolar disorder but was refusing to take his medication for that disorder and was having passive suicidal thoughts "in the form of

believing things could not get worse," but she did not believe that Kulp currently posed a threat to himself.  It is undisputed that Kulp told Defendant Quick that he did not have an active plan to harm himself and did not intend to harm himself. Defendant Quick did not believe that Kulp was suicidal or a risk to himself.  By using the term "passively suicidal" she meant that he was feeling hopeless and concerned about his alternatives.   Defendant Quick was of the opinion that Kulp did not "appear to pose a threat to himself currently, but does present [a] potential to decompensate rapidly as things progress legally."  Defendant Quick informed prison staff of those opinions.  Defendant Quick recommended that Kulp be kept in a "cell by guards and to be under observation."  Defendant Quick further recommended that Kulp see a counselor.

Defendant Quick was unfamiliar with the frequency of the prison staff's observation of Kulp but was aware that Kulp had been placed in THU-1 only a few steps from the intake or commitment area.

Defendant Smith interpreted Quick's recommendation to mean that Kulp should be kept in THU-1.  Defendant Smith did not alter Kulp's confinement in THU-1 or decrease the amount of scrutiny the correctional officers provided to Kulp.  When Defendant Smith went off duty, he relayed to the lieutenant relieving him of the need to keep Kulp under an informal watch.

26

Kulp was observed on his bed, watching television and communicating with prison staff on multiple occasions throughout his commitment at the Centre County Prison.

At 8:00 a.m., on Monday, August 27, 2001, Kulp saw the prison physician for a physical. See Doc. 145, Statement of Facts, Attachment #12, Exhibit L, page 2 of 6, Report of Physical Examination.[4]   The physician took no steps to obtain any mental health care for Kulp, nor did he make any recommendations relative to suicide prevention.

Kulp met with Defendant Timothy Gallu, the prison counselor on August 27, 2001, at approximately 3:30 p.m. During his meeting with Kulp, Defendant Gallu asked Kulp if he was feeling suicidal or if he wanted to hurt himself.  Kulp answered Defendant Gallu's questions in the negative.  Kulp also informed Defendant Gallu that he did not have a history of suicide attempts.  Defendant Gallu agreed with Quick's recommendation to maintain Kulp's current observation status and did not feel that it was necessary to place Kulp on a suicide watch.  Defendant Gallu told Kulp that he would like to refer him to the Mental Health unit of Centre County for an evaluation because of his prior diagnosis of bipolar disorder.  With respect

---

[4]The parties agreed that the physical exam occurred on August 27,  2001. However, they erroneously agreed that the day of the week was Sunday.  August 27, 2001, was a Monday. Furthermore, they erroneously agreed that the exam took place at 10:00 a.m.  The medical record indicates that the exam occurred at 8:00 a.m.

to this diagnosis, Kulp told Defendant Gallu that he did not take his medication because he was "stronger that the illness." Defendant Gallu recommended that he take his medication.   Kulp told Defendant Gallu that his arrest was a "wake up" and that he was amendable to seeing a mental health professional and trying psychiatric medications.

Kulp was observed sitting, alive and well, on his bed in his cell during a watch tour completed at approximately 10:38 p.m. on August 27, 2001.

Prior to Kulp's suicide on August 27, 2001, at or about 11:00 p.m., all of the correctional officer defendants - Veruete, Smith, Knepp, McClellan, Andrews, Shearer, Gates, and Stefanko - had received suicide prevention training from the prison.

Defendants McClellan, Andrews and Shearer worked the 3:00 p.m. to 11:00 p.m. shift on August 27, 2001.  Correctional Officers McClellan, Andrew and Stefanko knew that Kulp was to be under observation because he was housed in the THU-1.  See deposition of McClellan at page 33, lines 5-25; deposition of Andrews at page 48, line 24 and page 49, line 3; deposition of Stefanko at page 24, lines 16-20 and page 36, lines 4-12 and 24-25.  Defendant McClellan reviewed Kulp's suicide prevention screening report (the "Booking Screening Questionnaire") before Kulp's suicide.

At 10:59 p.m. Defendant Andrews was in the commitment

28

area.   The commitment area was near THU-1.   Defendant Andrews

shift ended, however, prior to the discovery of Kulp hanging in

THU-1.    Officer Andrews was not present at that time.

Similarly, Defendant Shearer's shift ended prior to the discovery

and was not present at that time.

Defendants Gates and Stefanko worked the 11:00 p.m. to

7:00 a.m. shift, beginning on August 27 and ending August 28,

2001.   Defendant Stefanko knew that Kulp was to be under

observation because Kulp had been placed in THU-1. Defendant

Gates had been off work the previous two days and had no prior

contact with Kulp.   Defendants Stefanko and Gates had been on

duty only approximately 6 minutes when Kulp was discovered

hanging in THU-1.

At 11:06 p.m., only twenty-eight minutes after the last

check on Kulp, Defendant McClellan noticed that he could not see

Kulp sitting or laying on his bunk so he decided to check on him

again.

Defendant McClellan found Kulp hanging by a shoelace

around his neck and attached to a bar on his window in his cell

(THU-1) at 11:06 p.m. on August 27, 2001.   Defendants McClellan

and Gates entered the cell and cut Kulp down.   Kulp was found to

have a pulse and the officers attempted to resuscitate him.

Emergency Medical Technicians were summoned and took over the

resuscitation efforts.   Kulp was transported to a hospital where

29

he was pronounced dead at 12:06 a.m. on August 28, 2001.

## IV.  Discussion.

Plaintiffs in their brief in opposition to the motion
for summary judgment filed by Defendants Veruete, Smith,
Stefanko, Knepp, McClellan, Andrews, Gates and Shearer concede
that the claims against Defendants McClellan, Andrews, Gates and
Stefanko should be dismissed.   Therefore, we will grant summary
judgment with respect to those Defendants and only consider the
claims leveled against Defendants Quick, Gallu, Knepp, Veruete,
and Smith.

The Court of Appeals for this circuit has addressed the
question of a state actor's responsibility for the suicide of an
incarcerated individual in two opinions in the same case.  First,
the Court of Appeals in Colburn I, supra, reversed a district
court's dismissal of a complaint in a suicide case.  The Court of
Appeals held that the district court should have permitted the
plaintiff to amend the complaint.  The Court of Appeals did not,
however, find the original complaint which contained boilerplate
statements sufficient.  It relied on various allegations set
forth in plaintiff's memorandum in opposition to defendants'
motion to dismiss and concluded that in light of those
allegations it was error for the district court to dismiss the
complaint without permitting an amendment.   The Court of Appeals
stated as follows:

The Complaint in this case alleges that defendants
knew or should have known that Stierheim was a
suicide risk. App. at 10.  While this allegation
standing alone may not have met this court's
standard for a modicum of factual specificity in
civil rights complaints, plaintiff, in her memorandum
in opposition . . . buttressed her complaint allegation
with the following facts which could have been asserted
in an amended complaint: (1) that the Upper Darby
police were familiar with Stierheim from previous
encounters as a result of her relationship with
members of the "Warlocks" motorcycle gang; (2) that
on the day before her suicide the Upper Darby police
had been called to Stierheim's apartment after
Stierheim had jumped from the window following an
argument with her boyfriend; (3) that Stierheim was
extremely depressed for personal reasons; (4) that
Stierheim had obvious scars on her right wrist from
a previous suicide attempt; (5) that the detaining
officer had to prevent Stierheim from swallowing
three Valium pills she had removed from her purse;
(6) that Stierheim was detained by the police
"for her own protection"; and (7) that Miller
found a live round of ammunition in Stierheim's
pocket. App. at 7-71.

We cannot conclude that as a matter of law that
these allegations are insufficient to state a
claim . . . .

It follows that the district court erred in
dismissing the complaint against Miller in her
individual capacity without permitting an
amendment . . . .

Id. at 670-71.  In the second opinion, Colburn v. Upper Darby

Township, 946 F.2d 1017, 1023 (3d Cir. 1991)(Colburn II) the

Court of Appeals affirmed the decision of the district court

granting summary judgment in favor of the defendants.

From these two opinions we glean several principles.  A

plaintiff in a prison suicide case under § 1983 has the burden of

presenting evidence in opposition to a motion for summary

judgment which establishes the following three elements: (1) that the detainee had a particular vulnerability to suicide: (2) the custodial officers knew or should have known of that vulnerability; and (3) those officers acted with reckless or deliberate indifference to the detainee's particular vulnerability.  Colburn II, 946 F.2d at 1023.  A plaintiff is required to present evidence from which a jury could reasonably find that all three elements have been established.  Id.  The Court of Appeals elaborated on the essential elements as follows:

> The requirement of a "particular vulnerability to suicide" speaks to the degree of risk inherent in the detainee's condition.  As several of our sister circuits have recently pointed out, the requirement of "reckless or deliberate indifference" implies that there must be "a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur."
>
> Even where a strong likelihood of suicide exists, it must be shown that the custodial officials "knew or should have known" of that strong likelihood . . . [T]here can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide.  . . .

Id. at 1024-1025 (citations omitted).  The Court of Appeals also defined the terms "know" and "should have known."  The Court stated that "Custodians have been found to 'know' of a particular vulnerability to suicide when they have actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." Id. at 1025 n.1 (citations omitted).  With regard to the phrase

32

"should have known" the Court of Appeals described it as a

> phrase of art with a meaning distinct from its usual
> meaning in the context of the law of torts.  It does not
> refer to a failure to note a risk that would be perceived
> with the use of ordinary prudence.  It connotes something
> more than a negligent failure to appreciate the risk of
> suicide presented by the particular detainee, though
> something less than subjective appreciation of that risk.
> The "strong likelihood" of suicide must be "so obvious that
> a lay person would easily recognize the necessity for"
> preventive action.

Id. at 1025.  The Court of Appeals made it abundantly clear that

a prison official cannot be held liable for mere negligence in

failing to recognize the necessity for preventive action.

Based on the review of the summary judgment record

outlined in part III of this opinion it is clear that Plaintiffs

have failed to present evidence from which it can be concluded

that Quick was deliberately indifferent to a particular

vulnerability of Kulp to suicide.  Quick examined Kulp

approximately five hours after his arrival at Centre County

Prison and found him depressed, anxious and confused.  Kulp

reported alcohol and marijuana abuse and told Quick that Kulp had

been diagnosed with bipolar disorder and had declined to take his

medication.  Quick characterized his statements that things could

not possibly get worse as "passive suicidal thoughts."  It was

her conclusion that Kulp did not appear to pose a suicide threat

at the time she evaluated him but that he did have the potential

to decompensate rapidly.

The requirement of a particular vulnerability to

33

suicide requires that there be a strong likelihood of self-inflicted harm rather than a mere possibility.  In this case, there are no allegations of a history of suicide attempts which were reported to Quick.  There is also no evidence which suggest a strong likelihood of suicide.  Moreover, there is no evidence from which a jury could reasonably conclude that Quick was deliberately indifferent.  Indeed the evidence reveals efforts by Quick to provide Kulp with care.  Quick recommended that Kulp be moved to a cell close to the guard station and kept under observation.  She also recommended that he be seen by a counselor from the prison which, in fact, occurred.  Finally, the only evidence with regard to Quick's contact with Kulp is that she interviewed him on August 26, 2001, at or about 7:52 a.m. and made certain recommendations. Kulp did not commit suicide until August 27, 2001, at or about 11:00 p.m., about 39 hours later. The evidence against Quick set forth in the summary judgment record is insufficient for a jury to conclude that Quick was deliberately indifferent to Kulp's medical and mental condition. We will, therefore, grant summary judgment in favor of Quick and against the Plaintiffs.

Likewise, with regard to Defendant Gallu there is no evidence from which a jury could reasonably conclude that he was deliberately indifferent.  Deliberate indifference as noted above is substantially more than negligence.  When Gallu interviewed

34

Kulp, Gallu told Kulp that he would like to refer him to a
psychiatrist and urged Kulp to take his medication.  Kulp agreed
with Gallu's recommendation and told Gallu that he was not
suicidal and did not have a history of suicide attempts.  There
is no evidence in the record from which it can be concluded that
Gallu had actual knowledge of a serious suicide threat or a
psychiatric diagnosis identifying suicide propensies and no
evidence from which it can be inferred that Gallu was
deliberately indifferent to Kulp's medical and mental condition.
We will grant summary judgment in favor of Gallu and against
Plaintiffs.

        We will now address the claims against the three
remaining defendants - Knepp, Veruete and Smith.  Defendant Knepp
served only one role with respect to Kulp.  Knepp conducted the
initial commitment screening.   That screening resulted in Kulp
being placed in administrative segregation.  Knepp after the
initial screening went to Defendant Veruete and advised her that
Kulp was upset.  Based on that report Veruete placed Kulp in
Temporary Housing Unit 1 near the commitment area so that he
could be closely monitored.   Veruete then contacted Centre
County Can Help to have a counselor come to the prison to talk
with Kulp.  When Veruete went off-duty she advised the Lieutenant
coming on duty of the actions that she had taken with respect to
Kulp and advised that officer, Lieutenant Smith, to keep an eye

on Kulp.   While Defendant Smith was on duty Kulp remained in THU-

1 and was observed on a regular basis.   Furthermore, during

Defendant Smith's shift Quick met with Kulp for several hours.

There is no evidence from which a jury could reasonably conclude

that Knepp, Veruete or Smith were deliberately indifferent to

Kulp's medical or mental condition or a particular vulnerability

of Kulp to commit suicide.   We will grant summary judgment in

favor of Knepp, Veruete and Smith and against the Plaintiffs.

       An appropriate Order will be issued.


                         s/Malcolm Muir
                         MUIR, U.S. District Judge

Date: November 1, 2006

MM:gs

36

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY D. KULP, Individually    :
and as Administrator of the      :
Estate of Timothy M. Kulp,       :
Deceased; and CAROL L. KULP,     :
                                 :
        Plaintiffs               :  No. 4:03-CV-1474
                                 :
    vs.                          :  Complaint Filed 8/25/03
                                 :
SONIA VERUETE, ET AL.,           :  (Judge Muir)
                                 :
    Defendants
```

ORDER

November 1, 2006


        1.   The motion for summary judgment filed by Defendants
Veruete, Smith, Stefanko, Knepp, McClellan, Andrews, Gates and
Shearer (Doc. 143) is granted.

        2.   The motion for summary judgment filed by Defendant
Quick (Doc. 146) is granted.

        3.   The motion for summary judgment filed by Defendant
Gallu (Doc. 140) is granted.

        4.   The Clerk of Court shall enter judgment in favor of
the Defendants  Veruete, Smith, Stefanko, Knepp, McClellan,
Andrews, Gates, Shearer, Quick and Gallu and against Plaintiffs.

        5.   Within 40 days Plaintiff shall show cause in

37

writing why summary judgment should not be granted in favor of Defendants John Doe No. 1-10 and against Plaintiffs.

      6.   The state law claims are dismissed without prejudice.


                     <u>s/Malcolm Muir</u>
                     MUIR, U.S. District Judge


MM:gs